UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
IN RE:                                                     :
                                                           :  Chapter 7
MOISE BANAYAN,                                             :  Case No. 08-60954
                                                           :
                                       Debtor.             :
                                                           :
---------------------------------------------------------- X
SIGNATURE BANK,                                            :
                                                           :
                                       Plaintiff,          :  Adv. Pro. Nos. 08-80042-6-dd
                                                           :  & 08-80073-6-dd
            -against-                                      :  (Jointly Administered)
                                                           :
MOISE BANAYAN,                                             :
                                                           :
                                       Defendant.          :
                                                           :
---------------------------------------------------------- X

# DEFENDANT'S PRETRIAL STATEMENT

Moise Banayan ("Banayan," or the "Defendant"), by and through his undersigned counsel, submits this Pretrial Statement, pursuant to the Court's Second Amended Scheduling Order, dated June 1, 2010 (Docket No. 48) (the "Scheduling Order").

**CONTESTED MATERIAL FACTS**

**I.  Introduction**

1.  In August 2005 Banayan was the sole owner of Ahava Food Corp. ("Ahava"), a distributor of kosher food products. Banayan also owned Lewis County Dairy Corp. ("LCD"), a dairy located in Lowville, New York, which manufactured kosher dairy products and St. Lawrence Food Corp. ("SLF"), a dairy located in Ogdensburg, New York, which also manufactured kosher dairy products. SLF and LCD

were manufacturing entities without any direct sales to customers, except to Ahava, their primary customer.

2. Banayan also owned Yoni Realty, LLC ("Yoni"). Yoni was a realty company that owned the property located at 110 Beard Street in Brooklyn, New York ("110 Beard"). 110 Beard was the principal place of business of Ahava. Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch") provided the mortgage on 110 Beard at that time.

## II. The Initial Credit Agreement

3. On August 22, 2005, as a consolidation of its existing loans, Ahava entered into a Master Credit Facility Agreement (the "Credit Agreement") with plaintiffs Signature Bank ("Signature").

4. The Credit Agreement consisted of two credit facilities including a single term loan in the amount of $2,000,000 ("Facility A"), and a revolving credit line of up to $5,500,000 ("Facility B").

5. In connection with the Credit Agreement, Banayan, LCD, SLF, and Yoni guaranteed Ahava's obligations under the Credit Agreement (the "Guaranty").

### A. Banayan's Personal Financial Statement

6. In connection with his Guaranty, Banayan provided Signature with a personal financial statement (the "2005 Financial Statement"). Banayan did not make any misrepresentations, intentional misstatements, or omissions, either orally or in writing, to Signature in connection with the 2005 Financial Statement or the Credit Agreement.

7. Banayan and his brother Fariborz Banayan ("Fariborz") had jointly formed Ahava of California, LLC ("AOC") in 2000. AOC was also in the business of distributing kosher food products and was a customer of Ahava.

8. On August 15, 2005 Banayan and Fariborz entered into a contingency sale agreement whereby Banyan agreed to sell his 50% share of AOC to Fariborz in exchange for his brother's share of the inheritance from their recently deceased father. This contingency sale provided Banayan with the infusion of cash he needed at the time but also provided him with a buy back option if he paid his brother back by January 2, 2007.

9. On the advice of his accountant Banayan continued to list an interest in AOC on his tax return in 2005 and 2006 (and AOC continued to list Banayan as having an interest in AOC) until the buy back period expired in January 2007. Banayan's 50% ownership of AOC was similarly listed on his 2005 Financial Statement. This ultimately was of no relevance to Signature as it readily concedes that Banayan's reported 50% ownership of AOC was not a factor in Signature's decision to enter into the Credit Agreement.

10. The 2005 Financial Statement also did not list a $4 million loan to Banayan from Isaac Chera in 2000, because, contrary to Signature's allegations, Banayan had not borrowed $4 million from Isaac Chera in 2000 or on any date prior to August 22, 2005 pursuant to a *shtar*[1] (or pursuant to any other loan agreement)[2].

11. From August 2005 through March 2007, Ahava regularly made timely payments of principal and interest on its promissory notes to Signature.

---

[1] A *shtar* is the rough equivalent of a contract under Judaic Law.
[2] As discussed below, Banayan's business dealings with Chera did not take place until 2006. Although a shtar was executed in 2006, no loan was ever extended pursuant to it.

### B. The Yoni Guaranty

12. In 2006, in connection with a refinancing of the Yoni mortgage with Merrill Lynch, it was discovered that, unbeknownst to Banayan, Signature's counsel, Herrick, Feinstein LLP, mistakenly filed a UCC-1 in Signature's name on Yoni in connection with the Yoni Guaranty. Signature recognized and acknowledged the mistake, and filed an amendment deleting the collateral.

13. As Signature had deleted the collateral and admitted that the filing of the UCC was a mistake, Banayan believed that Yoni was unimpaired, since any interest by Signature in Yoni would violate a lease and sublease agreement between Yoni and The New York City Industial Development Agency. Accordingly, in December 2006 Banayan conveyed 49% of his interest in Yoni to ISC 96 Beard Street LLC ("ISC"), an entity owned by Chera, in return for Chera's investment of $2.2 million in the renovation of 110 Beard.

## II. The Forbearance Agreements

14. By March 2007, Ahava had repaid more than $600,000 in principal and more than $80,000 in interest.

15. In January 2007, M&I First National Leasing Corp. ("M&I") obtained a $658,994.02 judgment against Ahava, LCD and Banayan (the "M&I Judgment"). The M&I Judgment related to a lawsuit involving financing of a waste management treatment plant at LCD. The judgment was procured by M&I's fraud, which consisted of falsely signing Banayan's name on a certain document. Banayan did not learn of the M&I Judgment until March or April 2007.

16. Despite Ahava's timely payment on its loan, the M&I Judgment was a technical default under the Credit Agreement and Signature issued a notice of default. This notice was used to compel Ahava to hire the consulting firm Getzler Henrich & Associates LLC ("Getzler") (at a cost of $38,000 a week) as a condition of Signature's agreement to forebear the default caused by the M&I Judgment.

17. Accordingly, in June 2007, the parties to the Credit Agreement, and Banayan's wife, Ana Banayan (as an additional guarantor), entered into a Forbearance Agreement.

18. In accordance with the Forbearance Agreement, Banayan provided Signature with another personal financial statement (the "2007 Financial Statement") which inadvertently continued to list Banayan as 100% owner of Yoni instead of 51%.

19. This inadvertent error was ultimately immaterial to Signature. *First*, as managing member of Yoni, Banayan had authority to commit Yoni to the Guaranty. *Second*, after learning that Banayan only owned 51% of Yoni, Signature nevertheless entered into two subsequent agreements with Banayan and Yoni, including the First Amendment to the Forbearance Agreement on August 27, 2007, and the Second Amendment to the Forbearance Agreement on September 11, 2007. *Third*, Signature ultimately foreclosed on Yoni and received 100% of the proceeds of the foreclosure sale.

## II. The Getzler Consultant

20. Even though he had no experience in the kosher dairy industry, Getzler's consultant, Mark Samson sought to effectively remove Banayan from control of Ahava, LCD, and SLF, instructing employees that Getzler, and not Banayan, was now in charge. In spite of representations in the Forbearance Agreement that Banayan remained in

control of all companies, Signature instructed Banayan that he should give Getzler full control of his companies.

21. During the period Getzler was at Ahava, LCD, and SLF, Getzler directed that milk supply be diverted, which then had to be sold at a loss; terminated a milk supplier leading to a shortage of milk for processing; reassigned personnel from the sales and accounts payable departments to write reports for Getzler resulting in increased sale prices and a decrease in collection activity, leading to losses of over 1 million dollars; extended credit to non-creditworthy customers, more than doubling bad debt to well over 1 million dollars; removed members of the LCD maintainance team resulting in a dramatic decrease in productivity; and spent large sums of money on discretionary expenses. Getzler's substantial weekly fees of $38,000 were also an onerous burden that the companies could ill afford given the amount of money which was being lost.

22. Market factors such as the substantial increase in the cost of milk and problems that interfered with Ahavas ability to import a certain products from Israel compounded the financial problems of the companies.

23. Ahava Foods, LCD, and SLF were hemorrhaging money under Getzler's management resulting in the incurrence of substantial overdrafts. However, Signature had no objection to these overdrafts as long as Getzler was involved.

24. There remained the problem that a number of bank accounts of Ahava and LCD were still restrained as a result of the M&I Judgment[3]. To deal with this judgment, Signature was part of a decision to use Schwartz and Sons Quality Distributors ("S&S")

---

[3] Signature initially failed to implement the required hold on the relevant bank accounts despite being served with separate notices by M&I. It was not until it was served a third time that Signature took the appropriate action. As a result, M&I later initiated an arbitration against Signature which resulted in Signature paying a $350,000 settlement to M&I.

to handle distribution and receivables from Ahava, LCD, and SLF (the four companies are hereinafter referred to collectively as the "Operating Companies").

25. As a result, the parties to the Forbearance Agreement and S&S entered a First Amendment to Forbearance Agreement in August 2007, which ensured that S&S had the same obligations to Signature that Ahava would have, and thus that Signature in no way would be affected by the decision. Rather, Signature benefitted greatly by this decision, as money could now flow freely through the accounts of S&S to Signature.

26. During this same time period – and during Getzler's tenure – AOC also handled distribution and receivables for Ahava, LCD and SLF. Accordingly, AOC became licensed to do business in New York and filed documents allowing it to do business under the assumed name of Ahava National Food Distributor.

27. This fact was known to both the Getzler consultant and Signature and the amount of accounts receivable deposited in AOC's HSBC account was reported to Signature on a regular basis, and transferred to accounts at Signature.

28. The Operating Companies continued to lose money under Getzler's mismanagement, and overdrafts necessarily continued. Signature seemed indifferent so long as Getzler was involved, and in September 2007 the parties to the First Amendment to Forbearance Agreement entered into a Second Amendment to Forbearance Agreement.

29. From June to November 2007, the Operating Companies lost millions of dollars as direct result of Getzler's poor decisions and ill-conceived policies. Additionally, the Operating Companies were forced to pay Getzler more than $450,000 in fees during this time.

30. Finally, in November 2007, Banayan had enough of Getzler's mismanagement and refused to continue to retain Getzler. With Getzler no longer involved with the Operating Companies, however, Signature refused to continue to allow the parties to the Credit Agreement to carry the overdrafts Getzler had caused.

31. Throughout the time Getzler was at the Operating Companies and afterwards, Banayan diligently and actively sought new financing to buy out Signature's position without success.

32. Once Signature refused to carry the overdrafts resulting from Getzler's mismanagement, there were no funds available to continue to operate the Operating Companies. Given the nature of the dairy industry, the Operating Companies would have been rendered worthless if they had ceased operations.

33. With Signature cutting off the life support to the Operating Companies and unable to secure financing from another source Banayan leased the LCD and SLF plants to AOC[4] at fair market value, to operate the without taking an ownership interest in them and distribute products on its (AOC's) own behalf. AOC made lease payments to SLF and LCD and invested in capital improvements to the facilities, and prevented the loss of jobs and industry from the region. AOC received no assets that were secured by any of the Signature liens.

34. This arrangement allowed Signature to gain the benefit of the preservation of its collateral that would have been rendered worthless but for AOC's operation of the LCD and SLF facilities. Any funds collected by AOC that were still attributable to Ahava or any of the Guarantors, were used by Ahava to pay the money it still owed its vendors in the ordinary course of its business.

---

[4] AOC was now 100% owned by Fariborz.

## IV. AEG

35. During all this time, Ahava, LCD, and Banayan were engaged in long-running litigation with the American Equities Group ("AEG"), or by 2005, the AEG Liquidation Trust.

36. Although Banayan had paid its debt to AEG in full in 2000, when AEG was in bankruptcy AEG's books were alleged to be missing and AEG launched an adversary proceeding to recover over $8 million it claimed it was owed by Ahava Dairy Products Corp. ("ADPC"), and which debt it alleged was guaranteed by LCD, Banayan, and a non-existent Ahava Products Corp. (the "AEG Action"). Ahava later was added as a defendant later even though it did not even exist until well after the 1996 factor financing agreement for ADPC.

37. During Signature's initial due diligence prior to entering into the Credit Agreement, it had a full opportunity to conduct an investigation into the AEG litigation and consult with Ahava counsel and its own counsel regarding the merits of the case.

38. The AEG Action sat dormant for years, until in mid-2007, the same time Getzler was in place and Ahava financial condition had deteriorated. The Getzler consultant was unwilling to allocate any money for legal fees, leaving Banayan, Ahava, and LCD with no option but to settle the action.

39. A settlement (the "AEG Settlement") was reached in the AEG Action in early 2008, by which time the Operating Companies had ceased operations (although AOC was leasing the LCD and SLF plants). Pursuant to the AEG Settlement, Ahava, LCD, ADPC and Banayan agreed to (i) pay AEG $250,000 in cash, comprised of an initial $25,000 payment, and nine monthly payments of $25,000 (the "AEG Settlement

Payments"), (ii) entry of a judgment in the amount of $3.5 million against LCD, ADPC and Banayan, and (iii) entry of judgment in the amount of $325,000 against Ahava. The AEG Settlement provided that if payments were not made, AEG would be entitled to the entry of a $3.5 million judgment against Ahava.

40. It was understood that aside from Ahava, none of the parties to the AEG Settlement would be able to pay a $3.5 million debt, and the actual cash expected to be paid were the total of ten payments from Ahava. However, Ahava did not have the funds to make these payments, and the presiding judge expected that AOC would have to fund Ahava's payments under the AEG Settlement.

41. Accordingly, Ahava sold its only easily salable asset remaining – its trademarks – to AOC in return for a commitment by AOC to pay the AEG Settlement Payments and prevent a substantial judgment from being levied against Ahava.

42. This sale of the Trademarks provided no benefit to Banayan, and ultimately did not result in any harm to Signature. Indeed, the corporation to which Signature eventually sold its interest in Ahava after it foreclosed on Ahava asserted that this sale included the trademarks, filed assignments with the United States Patent and Trademark Office, and now uses those trademarks. Accordingly, it is unclear what damage Signature suffered from the sale of the trademarks to AOC.

43. Banayan was not in any way involved with AOC's bankruptcy later in 2008, and indeed was out of the country for most of the period of AOC's bankruptcy.

44. In connection with the AOC bankruptcy and an action initiated by Signature against AOC in the Southern District of New York, Signature conducted

several audits of AOC's books and records. Signature subsequently discontinued its action against AOC.

V. **Other Factual Issues**

45. RTB Specialty Food was a company owned and operated by Banayan's daughter Rivka Banayan, and acted as a purchasing agent for AOC during AOC's bankruptcy. It had no existence beyond that limited role.

46. Although Banayan owned a substantial number of Persian rugs and antiques in 2005, by 2007 the value of Persian rugs had decreased due to changes in Iranian export policy. Many rugs and the antiques had been sold off to cover living expenses, yielding less than $100,000 in total.

47. Banayan did not knowingly or fraudulently make any false statement or material omissions on his Bankruptcy Schedules.

**CONTESTED LEGAL ISSUES**

48. Denying a debtor a discharge is an exceptionally harsh remedy, and courts, including Court, one have spoken eloquently to the fact that a denial of a discharge under section 523 or 727 is only a remedy to be granted in unusual cases. To sustain a cause of action under…§ 523…the creditor must establish each element of the statute by a preponderance of the evidence." Taneff v. Hoehn (In re Taneff), 190 B.R. 501, 505 (W.D.N.Y. 1995) ("[E]xceptions to the discharge of a debt are strictly construed against the creditor and liberally in favor of the debtor. Evidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code.") (internal punctuation and citations omitted); Scheidelman v.

Henderson (In re Henderson), 423 B.R. 598, 615-616 (Bankr. N.D.N.Y. 2010) ("Exceptions to discharge under § 523 must be [strictly] construed so as to give maximum effect to the Code's policy of providing honest but unfortunate debtors with a 'fresh start.'").

49. A simple breach of contract does not rise to the level of an exception from the discharge – more is required, specifically fraudulent intent. In re Henderson, 423 B.R. at 621 ("Debts and liabilities based solely upon a breach of contract are not excepted from discharge under" Section 523.). While Signature's allegations may rise to the level of breach of contract, they do not implicate the higher burden of exception to the discharge.

50. Although Signature contends that AOC, Ahava National, RTB, and others were insiders of Banayan, this simply is not the case. An individual or entity which is not one of the categories of statutory insiders enumerated in 11 U.S.C. 101(31) can still be an insider based upon "(1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.), 2010 Bankr. LEXIS 1714 (Bankr. N.D.N.Y. 2010). "Courts in this circuit have [also] taken the view that a creditor…who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider." Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256, 266 (Bankr. S.D.N.Y. 2002). The only companies Banayan exercised that level of control over were Ahava, LCD, SLF, S&S, and Yoni. Transactions with all other companies,

including AOC and its affiliates, were done strictly at an arm's length once Banayan was divested of his interest in AOC, as the evidence clearly shows.

51. In order to prevail under Section 523(a)(2)(A), Signature must prove that Banayan engaged in actual fraud, or knowingly made materially false pretenses or representations, which were *not* related to Banayan's or an insider's financial condition, and that Signature justifiably loaned money based on these supposed falsehoods or frauds and was damaged by them. In re Henderson, 423 B.R. at 621. ("False pretenses, false representation, and actual fraud represent differing concepts, but in each case, a creditor must show that the debtor's actions were purposefully deceptive or misleading.").

52. Conversely, if a statement does relate to Banayan's or an insider's financial condition, then pursuant to Section 523(a)(2)(B) the statement must be in writing, lead to the extension of funds, be materially false, have been relied on and reasonably so, and have been intended to deceive Signature. The law as to what is considered a statement regarding financial condition is unclear, but it is irrelevant – under either standard a material, intended, falsehood must have been made, and relied on to extend credit. Schneiderman v. Bogdanovich (In re Bogdanovich), 292 F.3d 104, 112 (2d Cir. 2002) (Noting that there is a split among the circuits whether to adopt a "strict" or broad approach to defining statements of financial condition, but declining to make a decision for the Circuit); Weiss v. Alicea (In re Alicea), 230 B.R. 492, 502 (Bankr. S.D.N.Y. 1999) (following the "strict" view that statements of financial condition are "limited to financial-type statements that are sufficient to determine the entity's overall financial responsibility.").

53. There was no falsehood in Banayan's statement of his interest in AOC in 2005. The sale of Banayan's interest had been a contingency sale with an option to repurchase his interest in AOC until 2007. Further, Signature has stated that they did not rely on Banayan's interest in AOC in making a loan to Ahava in 2005 – Banayan's interest in AOC was immaterial to Signature.

54. While Signature alleges that Isaac Chera made a loan to Banayan in 2000 documented by a *Shtar* – a loan document under Jewish law – the simple fact is that no such loan was ever made. Signature offers no evidence for such a loan beyond an undated hebrew document. This document was created in to 2006 and did not exist in 2005, and even then was never actually used to make a loan. Banayan could hardly commit any wrongdoing by not mentioning a loan that never existed.

55. Signature takes note of the fact that Banayan described the AEG lawsuit as having no merit and premised on AEG's fraud, and insists that this is a substantial falsehood. Signature had full and fair opportunity for, and already did comprehensive due diligence regarding that case, and extensive pleadings had already been filed with the Court in that case. The simple fact is that the AEG lawsuit had no merit and still has no merit, which is why it lay dormant for years. The only reason the case was settled is because when the AEG lawsuit was restarted in 2007, Banayan and his companies were in financial distress, and the bank and its consultants were unwilling to budget money for a defense. The fact that a settlement was made because funds did not exist to pay for a defense is not evidence that a suit had merit.

56. Even beyond proving falsehood of statements, Signature has a duty to prove that any such statements were material, and thus must demonstrate by a

preponderance of the evidence that it would not have entered into a transaction if it had known that a statement was false." Bethpage Fed. Credit Union v. Furio (In re Furio), 77 F.3d 622, 625 (2d Cir. 1996) (noting that this standard is the "recurring guidepost [for materiality] used by courts."). Where, as here, the debtor had substantial other assets which may have been sufficient to induce Signature to enter into the transaction, materiality of a particular representation is necessarily in greater doubt. In re Kayser, 121 B.R. 666, 669 (Bankr. D. Conn. 1990).

57. In the case of Signature's allegations regarding Yoni, Signature had an opportunity to demonstrate exactly what it would do if it were fully aware of a situation. In late 2006, under the impression that Signature had released its interest in Yoni, Banayan conveyed a 48.5% interest in Yoni to ISC 96 Beard St. LLC for $2.2 Million (this had nothing to do with the repayment of the fictitious loan Signature alleges). As part of the very substantial paperwork to the First Amended Forbearance Agreement, Banayan forgot to change the information about the ownership of Yoni. Banayan informed Signature of this mistake, and Signature nevertheless entered into a Second Amended Forbearance Agreement shortly thereafter. Banayan's informing Signature of the mistake shows a clear lack of intent to commit a falsehood, and the fact of the Second Amended Forbearance Agreement shows that the mistake as to the ownership of Yoni was not material.

58. In order to prevail on a claim for embezzlement under Section 523(a)(4), Signature must establish that it held an ownership interest in the property it claims was misappropriated. In re Bevilacqua, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985) (defining the first element of embezzlement as "fraudulent appropriation of property."). A lien is

not an ownership interest under Section 523(a)(4).  Deere & Co. v. Contella (In re Contella), 166 B.R. 26, 30 (Bankr. W.D.N.Y. 1994) ("Possessing only a lien, Deere & Company was neither the owner nor in possession of the assets. As owner of the collateral, the debtor remained the owner of its proceeds, even though both the collateral and its proceeds were subject to a security interest. No person can embezzle from himself."); see also Morganroth & Morganroth, PLLC v. Stollman (In re Stollman), 404 B.R. 244, 272-273 (Bankr. E.D. Mich. 2009) (Comparing cases, and holding that "the better reasoned cases are those that hold that embezzlement for § 523(a)(4) purposes only exists where the property in question was owned by another, and not by the debtor.")

59. Although Signature is fond of asserting that the assets of the parties to the Credit Agreement belonged to them, in fact it is undisputed that Signature only held a lien until it foreclosed, after the events in question.  What Signature is alleging boils down to an assertion that Banayan embezzled from himself, which Courts have held to be a legal impossibility.

60. Even if Signature had such an ownership interest, it must demonstrate that any embezzlement was done with "fraudulent intent."  Bd. of Tr., Adirondack Carpenters Pension Fund v. Parker (In re Parker), 388 B.R. 11, 21 (Bankr. N.D.N.Y. 2008) (declining to find embezzlement where insufficient evidence was put on to determine whether there was fraudulent intent).  No sales or other transfers were made with fraudulent intent – rather the purpose was to protect the value of the companies Signature held a lien in.

61. A claim of embezzlement further requires: "(1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the resulting

funds in an account accessible only to the debtor; and (3) the disbursal or use of those funds without explanation of reason or purpose." 4-523 COLLIER ON BANKRUPTCY P 523.10 (2010). Even if Signature can demonstrate that its liens were in fact property and that there was fraudulent intent, none of these factors apply in any circumstance Signature alleges.

62. Signature's allegation that Banayan should be denied a discharge in this action under Section 727(a)(2) for transfers from companies he owned is fatally flawed for a simple reason – the statute is limited by its terms to property of the debtor and the estate. The case law in this circuit is pellucid – assets belonging to non-debtor corporations which Banayan was a shareholder or sole shareholder of are not considered property of the debtor or the estate under Section 727(a)(2). Citik Ka Wah Bank Ltd. v. Wong (In re Wong), 291 B.R. 266 (Bankr. S.D.N.Y. 2003) ("[T]he term 'property of the debtor' …has reference to property in which the debtor has a direct proprietary interest. Causing a corporation to transfer assets does not support a denial of discharge pursuant to section 727(a)(2). There must be an actual transfer of property belonging to the debtor which thereby reduces assets that otherwise would have been available for distribution to general creditors."); Rothman v. Beeber (In re Beeber), 239 B.R. 13, 26 (Bankr. E.D.N.Y. 1999) ("An examination of caselaw finds that § 727(a)(2) requires that the property in question be property of the Debtor or property of the estate, not merely assets of a corporation where the Debtor is a shareholder of that corporation."); CIT Group/Factoring Manufacturers Hanover, Inc. v. Srour, (In re Srour), 138 B.R. 413 (Bankr. S.D.N.Y. 1992) ("It does not follow that because the debtor may have caused his corporation to transfer its assets in fraud of its creditors, it should also follow that the

transfer of property of another entity should support a denial of the debtor's discharge when he is not charged with having fraudulently transferred any of his own property within the meaning of 11 U.S.C. § 727(a)(2)(A)." ).

63. This doctrine makes sense looking to the structure of Section 727 – it is concerned not with how a debt occurred, but whether the debtor has attempted to secret assets away from the bankruptcy estate. Banayan did not attempt to hide his personal assets from the bankruptcy estate, and should be granted a discharge under 727.

64. Courts have repeatedly found that "In order to justify the refusal of discharge under a section 727(a)(2) transfer, it must be shown that there was an actual transfer of valuable property belonging to the debtor which reduced the assets available to creditors." In re Agnew, 818 F.2d 1284, 1289 (7th Cir. 1987); see, also, Town of Skaneateles v. Scott (In re Scott), 233 B.R. 32, 44-45 (Bankr. N.D.N.Y. 1998) (adopting In re Agnew's position and allowing a discharge where a violation of section 727(a)(4) produced no detriment to creditors). Signature has made no showing that any transfers reduced the assets available to creditors of Banayan in his bankruptcy proceeding.

65. Section 727(a)(4)(A) requires that the false statement or oath have been made in connection with the bankruptcy case (not prior conduct), and was made with fraudulent intent. In re Henderson, 423 B.R. at 618. In the instant case Signature uses Section 727(a)(4)(A) to allege minor errors in Banayan's schedules, but it is difficult to imagine that there was fraudulent intent for such things.

66. Partly to "ensure that debtors are not denied discharge for inconsequential or technical misstatements," Section 727(a)(4)(A) requires materiality. Henderson, Id. This Court has held that the test for materiality is "whether the false statement relates to

the debtor's business transactions or estate or whether it is pertinent to the discovery of assets or the existence or disposition of property." Id.  Far from being major assets or the conduit for the discovery of such assets, Signature alleges errors on Banayan's schedules which simply do not rise to the level of exceptions to the discharge.

## EVIDENTIARY ISSUES

There are no pretrial evidentiary issues at this time.  Pursuant to the Court's Second Amended Scheduling Order, objections to Plaintiffs Exhibits will be submitted by October 14, 2010

## IDENTIFICATION OF WITNESSES

Banayan will testify on his own behalf regarding the material contested facts described above and any other allegations asserted against him by Signature


Dated: October 8, 2010
New York, New York


                          COHEN TAUBER SPIEVACK & WAGNER, P.C.
                          *Attorneys for Moise Banayan*

               By: ____/s/_ Sari E. Kolatch_____
                      Sari E. Kolatch

               420 Lexington Avenue
               Suite 2400
               New York, NY 10170
               Phone: (212) 586-5800
               Facsimile: (212) 586-5095
               Sari E. Kolatch, Partner
               Email: skolatch@ctswlaw.com